ACCEPTED
05-14-01079-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
1/16/2015 11:17:19 AM
LISA MATZ
CLERK

*Oral Argument Requested*

## No. 05-14-01079-CR

## IN THE FIFTH COURT OF APPEALS OF TEXAS

FILED IN
5TH COURT OF APPEALS
DALLAS, TEXAS
1/16/2015 11:17:19 AM
LISA MATZ
Clerk

_____

## HENRY ANDRE WINZER,
*Appellant*

## V.

## THE STATE OF TEXAS,
*Appellee*

_____

## ON APPEAL FROM THE 422ND JUDICIAL DISTRICT COURT OF KAUFMAN COUNTY, TEXAS, CAUSE NO. 14-00334-422-F

_____

## APPELLANT'S BRIEF ON APPEAL

_____

GARY UDASHEN
STATE BAR NO. 20369590
gau@sualaw.com

SORRELS, UDASHEN & ANTON
2311 CEDAR SPRINGS ROAD
SUITE 250
DALLAS, TEXAS 75201
(214) 468-8100 Office
(214) 468-8104 Fax


COUNSEL FOR APPELLANT

## Issue Presented

I.    The trial court erred in denying Winzer's *Batson* challenge when the State used three of its ten peremptory strikes to remove the only three potential black jurors from the panel, thus ensuring that Winzer, a black man, was tried by an all white jury.

II.    The evidence is insufficient to find Winzer guilty of aggravated assault with a deadly weapon because the State failed to prove Winzer's teeth were a deadly weapon.

## IDENTITY OF PARTIES AND COUNSEL

Defendant:                                           Henry Andre Winzer

Defense Attorneys:                    Gary A. Udashen
Katherine L. Reed
Sorrels, Udashen & Anton
2311 Cedar Springs Road, Suite 250
Dallas, Texas 75201

Prosecutors:                               Marc Moffitt
Shelton Gibbs
Kaufman County District Attorneys
100 Mulberry
Kaufman, Texas 75142

Judge:                                         B. Michael Chitty
422nd Judicial District Court
Kaufman County, Texas

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED ...............................................................................................i

IDENTITY OF PARTIES AND COUNSEL ...................................................... ii

TABLE OF CONTENTS ................................................................................ iii

INDEX OF AUTHORITIES ...........................................................................iv

STATEMENT OF THE CASE .........................................................................v

STATEMENT REGARDING ORAL ARGUMENT ...........................................vi

STATEMENT OF THE FACTS ................................................................... 1-5

SUMMARY OF THE ARGUMENTS ........................................................... 5-6

ARGUMENT AND AUTHORITIES ........................................................... 6-21

    ISSUE I:   The trial court erred denying Winzer's *Batson* challenge to the State's use of its peremptory strikes to remove all potential black jurors.

    ISSUE II:   The evidence is insufficient to find that Winzer's teeth were a deadly weapon.

CONCLUSION .............................................................................................21

CERTIFICATE OF SERVICE .......................................................................22

CERTIFICATE OF COMPLIANCE ..............................................................23

# INDEX OF AUTHORITIES

**Cases**                                                                                    **Page**

*Batson v. Kentucky*, 476 U.S. 79 (1986) .......................................................... Passim

*Blackman v. State*, 414 S.W.3d 757 (Tex. Crim. App. 2013)................7, 8, 9, 10, 17

*Dowdle v. State*, 11 S.W.3d 233 (Tex. Crim. App. 2000) ......................................21

*Emerson v. State*, 851 S.W.2d 269 (Tex. Crim. App. 1993) ...........................8, 9, 10

*Ford v. State*, 1 S.W.3d 691 (Tex. Crim. App. 1999).............................................7

*Gale v. State*, 998 S.W.2d, 221 (Tex. Crim. App. 1999).........................................21

*Gibson v. State*, 144 S.W.3d 530 (Tex. Crim. App. 2004) .......................................9

*Goods v. Shoukfeh*, 943 S.W.2d 441 (Tex. 1997) ...................................................10

*Hernandez v. New York*, 500 U.S. 352 (1991)........................................................10

*Johnson v. California*, 545 U.S. 162 (2005) ...........................................................7

*Keeton v. State*, 749 S.W.2d 861 (1988)..........................................................8, 11

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ..............................................................9

*Moeller v. Blanc*, 276 S.W.3d 656 (Tex. App. – Dallas, 2008)...............................7

*Purkett v. Elem*, 514 U.S. 765 (1995)............................................................7, 8, 17

*Snyder v. Louisiana*, 128 S. Ct. 1203 (2008) .........................................................9

*United States v. Williamson*, 553 F.3d 269 (5th Cir. 2008)...............................9, 10

*Vargas v. State*, 838 S.W.2d 552 (Tex. Crim. App. 1992) ......................................9

*Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990)....................8, 10, 11, 14

*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991) ..........................................9

## Codes and Rules

TEX CODE CRIM. PRO. Art. 35.261 ...................................................................................5

TEX. PEN. CODE ANN. § 1.07 .................................................................................21

TEX. PEN. CODE ANN. § 22.01 .................................................................................3

TEX. PEN. CODE ANN. § 22. 02 (Vernon Supp. 2006) ......................................v, 3, 20

TEX. PEN. CODE ANN. § 233.01 (Vernon Supp. 2006) .................................................20

## Constitutional Provisions

U.S. CONST. amend. XI .................................................................................................5

U.S. CONST. amend. XIV .................................................................................................5

## STATEMENT OF THE CASE

On June 27, 2013, an indictment was filed charging Winzer with assault on a public servant. (CR: 125); *see* TEX. PEN. CODE § 22.01(b)(1). On February 21, 2014, a second indictment was filed against Winzer charging him with aggravated assault with a deadly weapon against a public servant. (CR: 8); *see* TEX. PEN. CODE § 22.02(a)(2). The State proceeded on the second indictment, Winzer pleaded not guilty, and a jury trial was held July 28, 2014 through July 30, 2014, before The Honorable Judge B. Michael Chitty. (RR2: 9, RR3: 2). The jury found Winzer guilty. (RR5: 46). Following the verdict, pursuant to a plea agreement between Winzer and the State, the court sentenced Winzer to five years imprisonment. (RR5: 51).

Winzer timely filed notice of appeal on August 8, 2014, and timely filed a motion for new trial on August 18, 2014. (CR: 88, 93). On September 29, 2014, the trial court held a hearing on Winzer's motion for new trial. (RR6: 1). Later that same day, the court denied Winzer's motion. (CR: 123).

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument in this case. The issues raised related to *Batson* are complex and fact-intensive and oral argument will be helpful to the Court's understanding. Additionally, the sufficiency of the evidence argument raises new and important issues and oral argument will also be helpful to the Court on that issue.

## STATEMENT OF THE FACTS

**The Arrest**

On April 27, 2013, law enforcement responded to multiple reports of a man with a gun on a county road in Frog, Texas. (RR4: 91; 170). Several neighbors reported a man behaving erratically, walking up and down the street, yelling at no one, kicking mailboxes, and wielding what appeared to be a gun, boat oar, and fishing pole at various times. (RR4: 20-21, 34-36, 42, 51-54, 74-76). Ultimately, most of the neighbors recognized the man as Gabriel Winzer ("Gabriel"), the appellant's son. (RR4: 23, 43, 61). Gabriel was a college graduate and his neighbors remembered him as a polite, successful, and well-behaved kid. (RR4: 26-27, 46, 83).

Law enforcement responded to the scene and Corporal Matthew Hinds testified that within minutes of his arrival a man matching the description of the suspect fired a shot at him. (RR4: 91-92). Shortly thereafter, additional officers arrive on the scene, and a confrontation erupted wherein Gabriel is shot multiple times by several officers. (RR4: 97-98, 175). Gabriel retreats to his father's home. (RR4: 98, 175). Gabriel is next spotted laying or kneeling on the ground in his father's backyard while law enforcement is surrounding the home. (RR4: 98, 126-27, 178). This is the first time officer's come in contact with Winzer, Gabriel's father, who is in the backyard attending to his son. (RR4: 125, 179).

Prior to entering the backyard, officers are giving Winzer and Gabriel various

commands to come out, get down, show their hands, and "something about a gun." (RR4: 99, 131). Winzer is attempting to help his son on to the porch and responds to police telling them, "Gabe needs help," "I don't trust the police," and "I don't know what's going on." (RR4: 132). Additionally, Winzer responds to police commands by tossing a gun out saying, "something to the extent of there's your gun." (RR4: 132-33). However, it turns out that this "gun" was a plastic toy that looked like a real gun. (RR4: 134). This is Winzer's first interaction with law enforcement that day.

Next, officers enter the backyard and several officers accost Winzer and Gabriel; both men resist arrest and two separate scuffles break out. (RR4: 138-41, 209-12). Corporal Hinds was dealing with Gabriel and testified that, although Gabriel had been shot, he was fighting, punching, and swinging at officers. (RR4: 143). Deputy Wheeler was one of three officers/troopers attempting to restrain Winzer while Hinds and others dealt with Gabriel. (RR4: 210-11). At some point during the struggle, Gabriel is tased twice and "about ten seconds after the second taser deployment, he stopped moving and died on the scene from gunshot wounds." (RR4: 153-54, 224).

Simultaneously, Winzer continues to struggle with officers. Deputy Wheeler testified that while he was attempting to place Winzer's arms in handcuffs, he felt Winzer bite his arm and he immediately drew his arm away. (RR4: 181, 218). The bite did not break Wheeler's skin, he was able to place Winzer's right arm behind

his back, and another trooper on the scene then tased Winzer. (RR4: 183-84). At this point, law enforcement is able to restrain Winzer. (RR4: 185).

After Winzer is detained and Gabriel is deceased, paramedics arrive on the scene while law enforcement, including the Texas Rangers, begin their investigation. (RR4: 231-32). Two officers involved in attempting to restrain Gabriel prior to his death, report and are treated for injuries to their hands at the scene. (RR4: 232). Both officers are sent to the hospital for follow up treatment. *Id*. No officer involved in restraining Winzer, including Deputy Wheeler, reports any injury on the scene. (RR4: 232-33). Nor was any injury related to Wheeler reported in the initial report to the Kaufman County Sheriff's Office. (RR4: 233-34). Nor was there any testimony regarding medical treatment for any bite wounds.

**The Trial**

On June 27, 2013, an indictment was filed charging Winzer with assault on a public servant related to this incident. (CR: 125); *see* TEX. PEN. CODE § 22.01(b)(1). On February 21, 2014, a second indictment was filed against Winzer charging him with aggravated assault with a deadly weapon against a public servant alleging teeth as the deadly weapon. (CR: 8); *see* TEX. PEN. CODE § 22.02(a)(2). The State proceeded to trial on the second indictment and on June 28, 2014, the trial commenced with jury selection. (RR3:2).

At the conclusion of voir dire, Winzer made a timely *Batson* objection on the basis that the State used three of their ten peremptory strikes to remove the only

potential black jurors from the jury.[1] (RR3: 208-10). One potential black juror, juror Pickron ("Pickron"), was struck by both the defense and the State. (RR3: 210). The trial court asked that the State provide an explanation for its use of the peremptory strikes, which removed all blacks from Winzer's jury. (RR3: 209).

The State offered that juror Long ("Long") was struck because she was a teacher and juror Mitchell ("Mitchell") and Pickron were struck because they "had issues with the police." (RR3: 209). In addition, the State argued that teachers, including white teachers, were struck because, "they're more sympathetic, generally speaking." (RR3: 211). Furthermore, with regard to Mitchell the State added that she stated she felt the system was unfair, the State claimed they struck every person who said they had a bad experience with the police. (RR3: 211-12). The trial court overruled Winzer's *Batson* challenge finding that the State provided race neutral reasons for making their strikes. (RR3: 213).

The next day, Winzer proceeded to trial with an all white jury over his renewed *Batson* objection. (RR4: 4-5). Winzer was ultimately convicted of aggravated assault with a deadly weapon against a public servant and sentenced to 5 years imprisonment. (RR5: 46, 51). On August 18, 2014, Winzer filed a motion for new trial arguing that the State violated *Batson*, as well as the Texas Code of Criminal Procedure, and the equal protection and due process clauses of the United

---

[1] Winzer is an African-American.

States and Texas Constitutions by exercising its peremptory strikes based on race. (CR: 93); *see Batson v. Kentucky*, 476 U.S. 79 (1986); TEX CODE CRIM. PRO. Art. 35.261; U.S. CONST. amend. XI, XIV. At a hearing on the motion for new trial, the State re-urged the explanations provided at trial concerning their peremptory strikes of the only three potential black jurors in this case and argued that there was no disparate treatment of black jurors. (RR6: 6-11). The trial court denied Winzer's motion for a new trial without specific findings. (CR: 123).

## SUMMARY OF THE ARGUMENT

ISSUE I:     The trial court erred by denying Winzer's *Batson* challenge. At trial, the State provided two explanations for its peremptory strikes of all three potential black jurors. (RR3: 209). First, one black juror struck was a teacher and the State's explanation for the strike was that teachers are more sympathetic, generally speaking. (RR3: 209-211). The juror was not questioned specifically regarding sensitivity and in fact denied being a sensitive person in response to a general panel inquiry by the State. (RR3: 85). Therefore, this explanation is an impermissible pretext for discrimination based on a group bias that was never shown to apply to the challenged juror. Second, the two remaining black jurors were struck because they, "had issues with the police," or thought the system in general was unfair. *Id*. The record in this case does not support the State's explanation. Rather, the record as a whole reveals the fallacy of the State's "neutral" explanations as well as a true discriminatory intent. As such, the judge's denial of Winzer's *Batson* objections at

trial and in a motion for new trial are clearly erroneous. Winzer should be granted a new trial.

ISSUE II: Winzer was convicted of aggravated assault with a deadly weapon. (CR: 86). The State alleged that Winzer's teeth were a deadly weapon. However, the State failed to provide any evidence that the teeth, in the manner of their use or intended use, were capable of causing death or serious bodily injury. The State elicited testimony from Deputy Wheeler teeth bites in general could disfigure a person, spread an infectious disease, or hit a vein. (RR4: 183). However, there was no evidence that the manner in which Winzer specifically used his teeth or intended to use his teeth was capable of causing serious bodily injury or death. Given that Winzer did not even use enough force with his teeth to break the officer's skin that would also not appear to be a reasonable inference from the evidence. Therefore, the evidence was legally and factually insufficient to support the deadly weapon finding.

## ARGUMENTS AND AUTHORITIES

## ISSUE I

**The trial court erred in denying Winzer's *Batson* challenge when the State used three of its ten peremptory strikes to remove the only three potential black jurors from the panel, thus ensuring that Winzer, a black man, was tried by an all white jury.**

**Applicable Law**

In *Batson v. Kentucky*, the United States Supreme Court held that using

peremptory strikes to exclude jurors solely based on race violates the equal protection clause of the fourteenth amendment to the United States Constitution. *Batson*, 476 U.S. at 79, 89, 106 (1986) ("[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure.") "The exclusion of even one juror for prohibited reasons invalidates the entire-jury selection process, so a trial court's erroneous denial of a *Batson* challenge always requires a new trial." *Moeller v. Blanc*, 276 S.W.3d 656, 659 (Tex. App. – Dallas, 2008).

When a *Batson* challenge is raised, the trial court should employ a three-step process to resolve the objection. *See Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013). First, the party opposing the peremptory strikes must establish a prima facie case of racial discrimination; second, the proponent of the strike must offer a race-neutral explanation; third, the court must decide whether the opponent of the strike has established racial discrimination by a preponderance of the evidence. *Id* (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999)). The first two steps of a *Batson* hearing are merely evidentiary. *Johnson v. California*, 545 U.S. 162, 171 (2005); *see also Purkett*, 514 U.S. at 767-68 (at the second step, the proponent of the strike need only offer an explanation that is racially neutral on its face). "It is not until the third step that the persuasiveness of the justification [for the peremptory strike] becomes relevant – the step in which the trial court determines whether the opponent of the

strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768; *see also Blackman*, 414 S.W.3d at 764.

Therefore, whether a race-neutral explanation was merely pretextual rather than genuine is a question of fact for the trial court in the third step of the *Batson* hearing. *Id*. "After a prosecutor gives nondiscriminatory reasons for striking prospective minority jurors from the venire, the trial judge must determine whether these facially neutral explanations are contrived to avoid admitting acts of discrimination." *Emerson v. State*, 851 S.W.2d 269, 273 (Tex. Crim. App. 1993). In *Emerson*, the Court of Criminal Appeals went on to explain:

> "In *Keeton*, we presented a non-exclusive list of factors which tend to show that the reasons or explanations given by the prosecutor are merely sham or pretext. *Keeton v. State*, 749 S.W.2d at 868. Presence of these factors also weighs against the legitimacy of a race-neutral explanation for the use of peremptory strikes. *Id*. Additionally, this type of evidence also tends to show that the State's reasons for using peremptory strikes are not actually supported by the record or are impermissible pretext. Such evidence may include 'an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' *Id*.; quoting *Ex parte Branch*, 526 So.2d 609, at 624 (Ala. 1987); *Whitsey v. State*, 769 S.W.2d at 714-15." *Id*.

**Standard of Review**

A trial court's resolution of a *Batson* issue is reviewed for clear error. *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990). "In applying this standard, a determination is made whether the trial judge's decision is supported by the record

so that it is not clearly erroneous." *Emerson*, 851 S.W.2d at 273. "The reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record." *Blackman*, 414 S.W.3d at 765 (citing *Young v. State*, 826 S.W.2d 141, 146 (Tex. Crim. App. 1991); *Vargas v. State*, 838 S.W.2d 552, 556 (Tex. Crim. App. 1992). While a trial court's *Batson* rulings are treated deferentially, "the Supreme Court has made plain that appellate review of alleged *Batson* errors is not a hollow act." *United States v. Williamson*, 553 F.3d 269, 274 (5th Cir. 2008) (applying clear error review to district court's *Batson* rulings) (citing *Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005)). "But a reviewing court should examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous." *Blackman v. State*, 414 S.W.3d at 765 (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)).

In this case, after both sides made their peremptory strikes, Winzer made a *Batson* objection challenging the government's use of three of its ten peremptory strikes to effectively remove the only potential black jurors in this case from the jury. (RR3: 208-12). Although one black juror was struck by both the State and the defense, Winzer argued the State's use of its peremptory strikes was prima facie

evidence of discrimination. (RR3: 209-10). The State then offered its "race-neutral" explanations for those strikes, which Winzer objected to as pretextual and not truly race-neutral. *Id*. The only issue before this court is whether the trial court's finding that the race-neutral explanations were genuine, and not pretextual is clearly erroneous. *See Blackman*, 414 S.W.3d at 764; *see also Goods v. Shoukfeh*, 943 S.W.2d 441, 445 (Tex. 1997) ("once a party offers a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination the preliminary issue of a prima facie case is moot) (citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *see also Williams*, 533 F.3d at 274 (5th Cir. 2008).

**Juror Long**

The trial court's denial of Winzer's *Batson* challenge related to the exclusion of Long by the State's peremptory strike is clearly erroneous because the State's "race-neutral" explanation based on group bias is unsupported by the record and thus pretextual pursuant to applicable case law.

The State explained that it used a peremptory strike on Long, one of three black potential jurors, solely because she is a teacher. (RR3: 209). The State further explained, "[W]e struck three white teachers as well. Teachers have long been an issue for the district attorney's office in Kaufman. They're more sympathetic, generally speaking." (RR3: 211). An examination of the record reveals that the only communication with Long in voir dire was during a discussion about the range of

punishment, when the State asked each juror individually if they could consider the entire range and Long responded, "Yes." (RR3: 68). Neither the State nor the defense asked Long any specific questions nor did she offer any additional information on any topic during voir dire. (RR3: 29-208). Likewise, the State did not ask the Long any questions regarding her sympathetic nature. *Id.* The State did ask the panel as a whole about sympathy and feeling sorry for a person saying, "[A]nybody just know himself, very sensitive to those kinds of things. Anybody?" (RR3: 85). Long did not identify herself as having a sensitive heart. *Id.* Furthermore, her ability to consider the entire range of punishment, probation to 99 years, which is the only information elicited from Long, belies the idea that she is somehow particularly sensitive.

Therefore, under *Emerson*, *Keeton,* and *Whitsey* this court should find that the State's race-neutral explanation regarding their strike of Long is prextual and impermissible because its based on a group trait, i.e. that teacher's are sensitive, that was not shown to apply to Long specifically. *See Emerson*, 851 S.W.2d at 273 (court found that evidence of a group bais not shown to apply to the challenged juror shows that the State's peremptory strikes are not actually supported by the record or are impermissible pretext); *Whitsey v. State*, 769 S.W.2d at 714-15. Likewise, the court in *Keeton* provided an example of pretext directly on point, "[F]or instance, an assumption that teachers as a class are too liberal without any specific questions having been directed to the panel or individual juror showing the potentially liberal nature of the challenged juror." *Keeton*, 749 S.W.2d at 868. Futhermore, in *Whitsey*,

when a prosecutor stated he struck a teacher because teachers tend to be liberal but he failed to ask the juror any questions to determine whether that was in fact true in her case, the Court of Criminal Appeals found that because the group bias was not found to apply to the challenged juror, the State's explanation was "facially contrived to avoid admitting acts of discrimination." *See Whitsey*, 796 S.W.2d at 716. Nothing in the record distinguishes Long from these cases.

Finally, contrary to the State's contention, the fact that the State also used peremptory strikes to challenge non-minority teachers on the panel does not cure the harm in this case. First, peremptory strikes on the basis of a group trait, which is not shown to apply to the particular juror challenged, can be considered pretextual regardless of the race of the juror. Certainly in this case, where a group bias that has not been shown to apply to Long specifically and is used to remove one of three black venire men resulting in an all-white jury, it serves as strong evidence of a discriminatory intent. Furthermore, a review of the entire record strengthens the conclusion that the State used its peremptory strikes in a discriminatory fashion. For example, during closing argument the prosecutor argues, to an all white jury,

> "And not only that, when his son is injured, instead of pulling his son in the house, the ambulance is there, he should have pulled his son out. The police told him your son needs medical attention. Let us in. Give yourself up. But for 15 minutes his son does not get medical attention, why? Because he's oppressed. Because he is a victim. He has been victimized, and his son is a victim; and all of us are pawns in this game, including me, an African American prosecutor who is unfairly prosecuting this man.

I don't appreciate being a pawn because that's not fair to me, and it's not fair to you." (RR5: 15)

This portion of the State's closing argument exposes the State's blatant racial motivations, which tainted Winzer's trial from voir dire to closing argument. *See Blackman*, 414 S.W.3d at 765. The State is attempting to convey to an all white jury that its inconceivable that Winzer could be the victim of any wrong doing by law enforcement or the State because a black prosecutor is prosecuting him. (RR5: 15). This Court should note that prior to this outburst no testimony, argument, or statement otherwise had been put before the jury regarding race in this case.

Therefore, the record clearly establishes the prosecutor striking Long because she is a teacher and teachers are generally sympathetic is pretextual, contrived and impermissible. Furthermore, the State did not offer nor does the record provide any additional justification for striking Long. In fact, the only information elicited from Long during voir dire was favorable to the State i.e. that she could consider the entire range of punishment. The trial court denied Winzer's *Batson* objection without making any specific findings on the record, either at trial or in the denial of his motion for new trial on the same grounds, a review of the record establishes the denial was clearly erroneous. On this basis alone, Winzer should be granted a new trial because his constitutional rights under the equal protection clause was denied under *Batson*.

**Juror Mitchell**

The trial court's conclusion that "the State has stated a race neutral reason for making their strikes," is clearly erroneous upon a review of the record. First, in response to Winzer's *Batson* objection on Mitchell the State provided that Mitchell was struck, along with other minority and non-minority venire men, because she "had issues with the police" or "law enforcement issues." (RR3: 209). However, a review of the voir dire record shows that is unsupported. During the State's voir dire, the prosecutor asks the panel,

> "[h]ow many of you all have had an issue with a peace officer? Like you feel like a family member or yourself have been mistreated in any way by a peace officer. You feel like the criminal justice system didn't treat your friend, son, husband, yourself fairly related to your case or a close friend's case." (RR3: 74)

To which Mitchell responds "no." (RR3: 77). Therefore, the record does not support the State's contention that Mitchell reported having problems with police or law enforcement. *See Emerson*, 851 S.W.2d at 273 (on appellate review the inquiry is whether the trial judge's decision is supported by the record); *see also Whitsey*, 769 S.W.2d at 714-15. At the *Batson* hearing, defense counsel informs the court that Mitchell, in fact, did not report having a problem with law enforcement. (RR3: 210). The State then responds by saying that she was struck because she said the system was unfair. (RR3: 210-211). In response to a question during the State's voir dire about whether panel members felt the system treated minorities unfairly, Mitchell

had the following interaction with the State:

> "MR. GIBBS: Do any of you all feel like the criminal justice system is unfair to minorities, blacks, Hispanics? Do you feel like the criminal justice system is unfair, it doesn't treat minorities fairly? Anybody on the front row?
>
> . . .
>
> MR. GIBBS: Ms. Mitchell, no?
>
> VENIREPERSON: Uh-ugh." (RR3: 82)

From that interaction it is not clear that Mitchell is in fact saying that the system is unfair. However, the parties call Mitchell up for individual questioning and have the following exchange:

> "THE COURT: You are one of several jurors ho said that you thought our system might not always be fair, is that correct?
>
> VENIREPERSON: Yes
>
> THE COURT: Let me just tell you that our system is not always fair. I think we would all agree on that.
>
> VENIREPERSON: Right.
>
> THE COURT: The fact that sometimes the train goes off track, can you put that aside in this case?
>
> VENIREPERSON: Mm-hmm.
>
> THE COURT: Consider only the evidence that you hear and see?
>
> VENIREPERSON: That's right.

THE COURT: Follow my instructions, be fair and impartial. Can you do those things?

VENIREPERSON: Yes, sir.

THE COURT: Mr. Gibbs.

MR. GIBBS: So the fact you Stated that the system was unfair, you won't factor that into this case at all?

VENIREPERSON: No.

MR. GIBBS: You feel like – have there been situations or personal experiences that make you believe that the system is not fair?

VENIREPERSON: Well, just not this system particularly. Stuff you see on TV. Just like the guy that killed four people, then the lady shot the gun.

MR. GIBBS: I haven't heard about that. Can you explain?

VENIREPERSON: About the guy that killed the four people in the car wreck, and he got probation. Then the lady shot the gun, she got 50 years, just stuff like that.
MR. GIBBS: Right. *Is there something specific about the system that you feel is unfair?*

VENIREPERSON: *Oh, no.* (RR3: 174-75).

This exchange with the court and the State establishes that, in fact, Mitchell did not believe that this particular system was unfair. At the very least, she did not express that the system was any more unfair than the court acknowledged everyone is aware of. (RR3: 174). Therefore, the explanation that she was struck because she believed the system was unfair cannot be said to be race neutral in light of the record.

It is not sufficient that the State simply provide a race neutral explanation for strikes challenged under *Batson* rather the race neutral explanation must be genuine and born out through the record. *See Purkett*, 514 U.S. at 768; *see also Blackman*, 414 S.W.3d at 764. Also, this Court should note that Winzer notified the trial court at the *Batson* hearing that the State was misrepresenting Mitchell's testimony.

Given the State's improper closing arguments related to race it becomes even more clear that the justifications given for the challenged jurors were not race neutral. This is especially true considering that the State did not strike juror Carr, a white panel member who ended up on the jury, when she actually *did* testify to having a bad personal experience with the police. (RR3: 142). In addition, the State did not strike juror Lowe, another white panel member who ended up sitting on the jury, who actually *did* testify to having a negative personal experience with law enforcement. (RR3: 177). The State's explanation of Mitchell's strike that, "every person that said that they had a bad experience with a police officer, we struck them, with the exception of two persons . . . Mr. Carr . . . Ms. Haney," is simply untrue. (RR3: 211-12). In fact, two persons, Carr and Lowe both white, who each testified to a personal negative experience with police officers, sat on this jury. Yet the State would have this Court believe that they struck Mitchell on this basis, even though Mitchell did not report a negative personal experience with police officers.

**Juror Pickron**

The trial court's conclusion that "the State has stated a race neutral reason for

making their strikes," is clearly erroneous upon a review of the record. As with Mitchell, the State claimed at the *Batson* hearing that Pickron was excluded either because she had issues with the police or because she believed the system was unfair. (RR3: 209-211). First, as with Mitchell, the record does not support the State's first contention that Pickron testified to having had issues with the police. The State represented to the court at the *Batson* hearing, "The rest of them, your Honor, were those who had issues with the police. That would include Ms. Pickron or Ms. Mitchell." (RR3: 209). In fact, the State had the following exchange with Pickron during voir dire:

> ""[h]ow many of you all have had an issue with a peace officer? Like you feel like a family member or yourself have been mistreated in any way by a peace officer. You feel like the criminal justice system didn't treat your friend, son, husband, yourself fairly related to your case or a close friend's case." (RR3: 74)

To which Pickron responded, "No." (RR3:77). The State faces the same insurmountable facts with regard to their explanation for striking Pickron, which along with their Long and Mitchell strikes ensured an all white jury for Winzer, a black male. First, their explanation regarding problems with police officers is wholly unsupported by the record. The fallacy of this explanation is further highlighted by the fact that two white venire men, both of whom actually did report negative personal experiences with the police, sat on the jury.

With regard to the State's second neutral explanation that Pickron more

generally believed the system was unfair, the trial court had the following exchange with Pickron:

"THE COURT: Good. During our voir dire you indicated that the system you felt like was not always fair.
VENIREPERSON: I think they're not always.
THE COURT: I don't think there is any doubt that the system is not always fair.
VENIREPERSON: Yes, sir.
THE COURT: Let me just ask you, would that view that you hold impact your ability to sit as a juror on this case, consider only the evidence presented during the course of the trial, follow my instructions, and be fair and impartial?
VENIREPERSON: No, sir. I feel that I could be fair and impartial because I would follow the instructions, and I would always hold count what was presented.
THE COURT: Do you have any questions, Mr. Gibbs?
MR. GIBBS: Not on this issue." (RR3: 172-73)

Pickron unequivocally Stated that she could be fair and impartial, the State allegedly struck her because of her belief that the system is not always fair. The prosecutor's improper racial statements during closing argument compounds the weakness of the State's explanation and lays bare for this Court the State's genuine intentions. In addition, Pickron, the third and last potential black juror struck by the State, was detention service officer at the Dallas Sheriff's Office, which is an undeniably favorable occupation for a State juror. In fact, the defense questioned Pickron specifically about her career and elected to use a peremptory strike on her. (CR: 94). Although, this juror was double struck by the defense and the State, the facts discussed herein further illuminate the State's discriminatory motives.

**Conclusion**

The neutral explanations provided by the State regarding Mitchell and

Pickron, seemingly accepted by the trial court although absent specific findings, are clearly not supported by the record. In addition, the State's neutral explanation for striking Long, based on a group bias that the record does not establish applies to Long, is clearly pretextual and prohibited under the case law. Thus, the trial court's denial of Winzer's *Batson* objection at trial and in his motion for new trial is clearly erroneous. This court's review of the *Batson* issues, while highly deferential is not "hollow" for cases such as this one. Wherein the record and the applicable case law are wholly unsupportive of the trial court's findings. Winzer was denied his constitutional rights under the equal protection clause, which *Batson* is designed to protect.

## ISSUE II

**The evidence is not legally sufficient to support Winzer's conviction for aggravated assault with a deadly weapon. Specifically, the State failed to prove beyond a reasonable doubt that Winzer used or exhibited a deadly weapon as charged in the indictment. (CR: 8).**

**Applicable Law**

A person commits the offense of aggravated assault if he intentionally, knowingly, or recklessly causes bodily injury to another and either (1) causes serious bodily injury to the person or (2) uses or exhibits a deadly weapon during the commission of the assault. TEX. PEN. CODE ANN. §§ 233.01, 22. 02 (Vernon Supp. 2006). "Bodily injury" refers to physical pain, illness, or any impairment of physical

condition. *Id* § 1.07(a)(46) (Vernon Supp. 2006). And "deadly weapon" is defined as "anything that *in the manner of its use or intended use* is capable of causing death or serious bodily injury." *Id* § 1.07(a)(17)(B) (emphasis added).

**Standard of Review**

In reviewing a claim of legal insufficiency with regard to a deadly weapon finding, "we view the evidence in a light most favorable to the finding and determine whether any rational trier of fact could have found beyond a reasonable doubt that the defense used or exhibited a deadly weapon." *Gale v. State*, 998 S.W.2d, 221, 225 (Tex. Crim. App. 1999); *see also Dowdle v. State*, 11 S.W.3d 233, 237-238 (Tex. Crim. App. 2000).

## CONCLUSION

For all these reasons, Winzer requests that this Court reverse his conviction m render a judgment of acquittal and remand this case for a new trial.

Respectfully submitted,

/s/ Gary Udashen
GARY UDASHEN
Bar Card No. 20369590
gau@sualaw.com

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 (fax)

Attorney for Appellant

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing Appellant's Brief was mailed to the Kaufman County District Attorney's Office, 100 W. Mulberry, 2nd Floor, Kaufman, Texas 75142, on this 16th Day of January, 2014.

       /s/ Gary Udashen
       GARY UDASHEN

# CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4(I)(3), undersigned counsel certifies that this brief complies with:

1. The type-volume limitation of TEX. R. APP. P. 9.4(I)(2)(A) because this petition contains 5,286 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(I)(1).

2. The typeface requirements of TEX. R. APP. P. 9.4(e) and the type style requirements of TEX. R. APP. P. 9.4(e) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14-point Times New roman.

     /s/ Gary Udashen     
Gary Udashen
